UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
FAIRFIELD SENTRY LIMITED (IN          :
LIQUIDATION), acting by and through the  :
Foreign Representatives thereof, and     :
KENNETH KRYS, solely in his capacity as  :
Foreign Representatives and Liquidator   :          19-CV-3911 (VSB)
thereof,                                 :      (Administratively Consolidated)
                                         :
            Plaintiffs/Appellants,       :        **OPINION & ORDER**
                                         :
              - against -                :
                                         :
                                         :
CITIBANK, N.A. LONDON,                   :
                                         :
            Defendants/Appellees.        :
-------------------------------------------------------X

Appearances:

David Lawrence Elsberg
Caitlin Joan Halligan
Andrew Riggs Dunlap
Yelena Konanova
Evan Noller Bianchi
Selendy & Gay, PLLC
New York, New York

David J. Molton
Marek Patrick Krzyzowski
Brown Rudnick LLP
New York, New York

*Counsel for Plaintiffs-Appellants*

Jeffrey A. Rosenthal
Nowell D. Bamberger
Thomas J. Moloney
Joseph Michael Kay
Carmine D. Boccuzzi, Jr.
Eva Pascale Smith Bibi
Cleary Gottlieb Steen & Hamilton LLP
New York, New York

Bruce Stephen Kaplan
Jeffrey Carl Fourmaux
Friedman Kaplan Seiler & Adelman LLP
New York, New York

Andrew M. Harris
Hogan Lovells US LLP
New York, New York

Marc Joel Gottridge
Herbert Smith Freehills New York LLP
New York, New York

*Counsel for Defendants-Appellees*

Alan Kolod, Mark Nelson Parry
Moses & Singer LLP
New York, New York

*Counsel for Appellees Deutsche Bank (Cayman) Limited, Deutsche Bank (Suisse) SA, and Deutsche Bank Trust Company Americas*

<u>VERNON S. BRODERICK</u>, United States District Judge:

This case arises from the infamous Ponzi scheme orchestrated by Bernard L. Madoff through his investment company Bernard L. Madoff Investment Securities LLC ("BLMIS"), which wreaked havoc throughout the financial industry and investment community after the scheme was exposed in 2008.[1]  Plaintiffs-Appellants ("Appellants" or "Liquidators") are liquidators of three investment funds who used to be the major feeder funds of BLMIS; they bring claims against a group of investors, or transferees of investors, who cashed out shortly before the scheme collapsed ("Defendants-Appellees" or "Appellees").  Now before me are two rounds of appeals from a series of orders issued by United States Bankruptcy Judge Stuart M. Bernstein of the Bankruptcy Court of the Southern District of New York (the "Bankruptcy

---

[1] Details about Madoff's Ponzi scheme have been recounted by many courts.  *See, e.g.*, *In re Madoff*, 598 B.R. 102, 106 (S.D.N.Y. 2019), *aff'd* 818 F. App'x 48 (2d Cir. 2020).  I do not recount it here except as to provide context to the appeals.

Court"), which partially dismissed Appellants' claims and denied them leave to amend.  Because

Appellants' claims are barred by (1) lack of personal jurisdiction under the relevant choice of

forum provision, (2) the safe harbor provision under the Bankruptcy Code, (3) the British Virgin

Islands' Companies Act, and (4) res judicata with regard to certain constructive trust claims, the

Bankruptcy Court's decision is AFFIRMED.

## I.  **Factual Background**

### A.  *The Funds*

Fairfield Sentry Limited ("Sentry"), Fairfield Sigma Limited ("Sigma"), and Fairfield

Lambda limited ("Lambda") (collectively, the "Funds") were British Virgin Islands ("BVI")

investment funds that heavily invested in BLMIS.  (PAC ¶ 2.)[2]  Sentry was the largest of all the

feeder funds[3] of BLMIS, while Sigma and Lambda were indirect BLMIS feeder funds

established for foreign currency investments through purchases of shares of Sentry.  (*Id*.)  The

Funds operated by pooling money from investors and issuing shares in return, and investors like

Defendants became members of the Funds by entering into a series of subscription agreements

(the "Subscription Agreement") for the purchase of shares in the Funds.  (*Id*. ¶ 3.)  The members'

relationship with the Funds was governed by the Subscription Agreement, the Articles of

Association (the "Articles" or singular "Article"), as well as certain other documents.  (*Id*. ¶ 8;

---

[2] "PAC" refers to Appellants' proposed amended complaint filed in *Fairfield Sentry Limited et al. v. Citigroup Global Markets Limited et al.*, Adv. Pro. No. 11-02770 (Bankr. S.D.N.Y.), which was filed in the consolidated adversary proceeding before the Bankruptcy Court as an exhibit to the declaration of David J. Molton in support of Appellants' motion for leave to amend.  I use it here as a representative example of Appellants' proposed complaints in this consolidated action.  *See Fairfield Sentry Ltd. (In Liquidation), et al. v. Theodoor GGC Amsterdam, et al.*, No. 10-ap-03496 (SMB) (Bankr. S.D.N.Y. 2018) ("Bankr. Doc."), Bankr. Doc. 942 Ex. B, at 224.  This PAC is largely identical to the proposed amended complaints filed in other consolidated cases on issues relevant to this appeal.  (*See* Doc. 281, at 4 n.2.)

[3] "A feeder fund is an entity that pools money from numerous investors and then places it into a 'master fund' on their behalf."  *In re Picard*, 917 F.3d 85, 92 (2d Cir. 2019) (explaining the mechanism of BLMIS).

Hare Decl. ¶ 10.)[4]

      Article 10 sets out the procedure for members of the Funds to redeem their shares.  (*See* Articles § 10.)[5]  Upon receipt of a written redemption request from a member, the Funds were obligated to redeem or purchase the member's shares at a redemption price ("Redemption Price") based on the Net Asset Value per share (the "NAV") as of the close of the relevant business day.  (*Id*. § 10(2).)  Article 11 specifies how the NAV was to be calculated; it provides that:

> The Net Asset Value per Share of each class shall be determined by the Directors as at the close of business on each Valuation Day . . . . [and] shall be calculated at the time of each determination by dividing the value of the net assets of the Fund by the number of Shares then in issue or deemed to be in issue[.]
>
> Any certificate as to the Net Asset Value per Share or as to the Subscription Price or Redemption Price therefor given in good faith by or on behalf of the Directors shall be binding on all parties.

(*Id*. § 11(1).)

      The NAV was calculated by the Funds' administrator, Citco Fund Services (Europe) B.V. and its delegatee Citco (Canada) Inc. (together, "Citco").  (PAC ¶ 41.)  Under the Administration Agreement between the Funds and Citco, the directors of the Funds ("Directors") delegated to Citco their authority to "redeem Shares in accordance with the provisions and procedures set out in the applicable Fund Documents," including the Articles.  (Admin. Agreement ¶ 3.4.)[6]

      Relevant to this appeal, the Subscription Agreement contains a choice of forum clause,

---

[4] "Hare Decl." refers to the declaration of William Hare in support of Appellants' motion for leave to amend ("Hare Declaration").  (Bankr. Doc. 925.)

[5] "Articles" refers to the Articles of Sentry filed in the Bankruptcy Court as an exhibit to the Hare Declaration.  (*See* Hare Decl. Ex. F.)  Because the Articles were substantially identical for all three Funds, (Hare Decl. ¶ 10(a)), I cite to this version for convenience.

[6] "Admin. Agreement" refers to the Administration Agreement between the Funds and Citco that was filed in the Bankruptcy Court as an exhibit to the declaration of Philip Kite in opposition to Appellants' motion for leave to amend and in support of Appellees' motion to dismiss ("Kite Declaration" or "Kite Decl.").  (Bankr. Doc. 963 Ex. O.)

which provides:

> New York Courts. Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York.  Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum.

(PAC ¶ 22; *see also* Subscription Agreement § 19.)[7]

### B.  *The Fraud*

As early as 2000, Citco's employees started to raise concerns about BLMIS's investment. They realized that the existence of the Funds' assets at BLMIS could not be verified, and that Madoff's purported investment returns appeared too good to be true.  (PAC ¶ 44.)  Citco Group's[8] head of internal audit, Ruud Bodewes, raised concerns to the general counsel and manager of Citco Bank Nederland N.V. Dublin Branch (which acted as the Funds' custodian) that Citco might "be in a potential [sic] dangerous situation, since [they did] not seem to have an independent source to verify the information from BLMIS."  (*Id.* ¶¶ 46, 50.)  Moreover, Citco's head of internal audit for its administrator entities, Ger Jan Meijer, warned Citco Group's Chief Executive Officer, Christopher Smeets, that BLMIS could be a fraud, and that Citco had "a legal obligation to obtain more assurance" of the Funds' assets.  (*Id.* ¶¶ 47, 50–51.)  Meijer later reiterated his concerns, but was told by a member of the administrator's management to "stop raising the issue."  (*Id.* ¶¶ 51, 55.)  Nevertheless, Meijer was assured that Citco "would try to meet with Madoff to investigate."  (*Id.*)

---

[7] "Subscription Agreement" refers to the Subscription Agreement for Fairfield Sentry Limited which was filed by Defendants-Appellees in the Bankruptcy Court as an exhibit to the declaration of Thomas J. Moloney in opposition to Plaintiffs-Appellants' motion to dismiss.  (Bankr. Doc. 961 Ex. A.)

[8] Appellants do not define "Citco Group" in the PAC or in their Opening Brief, but the term appears to refer to Citco Group Limited, (*see* PAC ¶ 45), and/or one or more of its related entities.

On three separate occasions between May 2000 and December 2002, Citco tried to verify the existence of the Funds' assets at BLMIS, and failed each time. (*Id.* ¶¶ 52–61.) No further attempt was made. (*Id.* ¶ 61.) Nor did Citco warn the investors of its inability to verify the existence of the Funds' assets at BLMIS, withdraw from its position as the Funds' administrator, or cease to determine the NAVs for share redemption based on BLMIS's suspicious returns. (*Id.* ¶¶ 62–64.) In 2004, however, in an effort to protect its own assets, Citco's Directors decided to "close down all credit relationships with the Funds to decrease Citco's exposure." (*Id.* ¶ 65 (internal quotation marks omitted).) Moreover, in 2006, Citco negotiated for an 800% increase in its custodian fees as a condition of continuing to do business with the Funds. The new fee was a percentage of the NAV as determined by Citco itself based on the purported returns of the Funds, which was in turn based on the purported returns of BLMIS. (*Id.* ¶ 68.) In other words, Citco did so despite its years of suspicion that BLMIS's returns were highly inflated and that the Funds' NAV was inflated as a result. (*See generally id.* ¶¶ 68–74.)

## II.   **Procedural History**

### A.  *The BVI Proceedings*

Shortly after Madoff's Ponzi scheme collapsed and the fraud was exposed, the Funds entered into liquidation proceedings before the Commercial Division of the Eastern Caribbean High Court of Justice of the BVI (the "BVI Court"), and Appellants were appointed as liquidators (i.e. "Liquidators") responsible for protecting and distributing assets for members of the Funds.[9] (PAC ¶¶ 26, 81). The Liquidators then initiated proceedings in the BVI (the "BVI Proceedings") against a number of members or transferees of the members of the Funds who

---

[9] According to the Notice of Change Status filed on January 31, 2020, (Bankr. Doc. 2879), Appellants Kenneth Krys and Greig Mitchell were appointed as Joint Liquidators by the BVI Court upon the resignation of their predecessors in 2011 and 2019. The two have since served as the foreign representatives in this action. (*Id.*; *see also* PAC ¶ 26.)

redeemed some or all of their shares before the collapse of the scheme (the "Redeemers")

seeking to recover from these Redeemers the redemption payments from the Funds (the

"Redemption Payments"), and planned to distribute the recoveries equitably among members.[10]

(*See* Open. Br. I 6.)[11]   The theory of the claims made by the Liquidators was that the Redemption

Payments were mistakenly calculated based on the fictitious, inflated NAVs, such that the

Redeemers received much higher payments than what the redeemed shares were actually worth.

*See Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 596 B.R.

275, 284 (Bankr. S.D.N.Y. 2018) ("*Fairfield II*").   The Liquidators' theory for recovery in the

BVI Proceedings was based purely on the parties' mistake of facts, and there was no allegation

that Citco or the Funds were aware of Madoff's fraud or acted in bad faith.   *Id.* at 289.

### 1.   The BVI Court Decision

In 2011, the BVI Court issued an opinion after a trial on two "preliminary issues:"[12] (1)

whether various communications sent to the Redeemers constituted "certificates" of NAV within

the meaning of Article 11 and were therefore binding on the Funds (the "Certification Issue"),[13]

and (2) whether the Redeemers gave good consideration for the Redemption Payments by

surrendering their shares (the "Good Consideration Issue").[14]   *See Fairfield II*, 596 B.R. at 285.

---

[10] When a Ponzi scheme collapses, those who have already withdrawn some or all of their funds and recovered some or all of their investments are insulated from loss to a certain degree, while those whose money is still invested will suffer substantial loss, and sometimes receive nothing in return.   *See Fairfield Sentry Ltd. (In Liquidation) v. Migani*, [2014] UKPC 9, 2014 WL 1219748 (2014) ("*Migani*"); *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 232 (2d Cir. 2011) (describing the nature of Ponzi schemes).

[11] "Open. Br. I" refers to the Plaintiffs-Appellants' Opening Brief for the first round of appeals.   (Doc. 22.)

[12] Under the BVI law, "[a] preliminary issues trial is a mechanism for deciding specific issues that are likely to resolve the case."   *Fairfield II*, 596 B.R. at 284.

[13] The "communications" were in the form of ordinary course emails sent to shareholders by Citco communicating the final NAV per share for the month, and emails from Citco to shareholders communicating the monthly statement for the individual shareholder.   *Migani* ¶ 16.

[14] Under BVI law, if a payment made by mistake was nevertheless properly due to the payee, i.e. the payee has released "good consideration" for the payment, then the payment is not recoverable under a restitution theory. (Open. Br. I 21 n.5 (citing Graham Virgo, *Good Consideration Provided by the Defendant*, The Principles of the

The Redeemers argued that a finding that the communications were certificates or that the Redeemers had given good consideration would provide a complete defense to the Liquidators' claims. *Id*. at 284. In making its ruling, the BVI Court did not address any factual issues. (*See* Open. Br. I 18 n.4.)

With regard to the Certification Issue, the BVI Court ruled that the various communications sent to the Redeemers were not "certificates" within the meaning of the Articles. *Fairfield II*, 596 B.R. at 286; (*see also* BVI Decision ¶ 33.)[15] However, the BVI Court ruled in favor of the Redeemers on the Good Consideration Issue. *Id*. Specifically, it found that the Redeemers paid good consideration for the Redemption Payments by surrendering their shares with the Funds, and, consequently, the Liquidators were barred from recovering those payments. (BVI Decision ¶¶ 34–36.) Specifically, the BVI Court wrote that:

> Left to myself I would have held that the redemption of shares in this case amounted to a bargain and sale for which the consideration received by Sentry was the surrender of the rights of the redeeming shareholder.
>
> . . . .
>
> [A] party will not be able to recover a payment made by mistake where the payer has received consideration from the payee.
>
> In my judgment, therefore, it is not open to Sentry now to seek to recover the price which it paid for the purchase of the shares of redeeming investors simply because it calculated the NAV upon information which has subsequently proved unreliable for reasons unconnected with any of the redeemers.

(*Id*.)

## 2. The ECCA Appeal

---

Law of Restitution 189–91 (3d ed. 2015); Robert Goff & Gareth Jones, *Good Consideration*, The Law of Unjust Enrichment 822–25 (9th ed. 2016).)

[15] "BVI Decision" refers to the decision of the BVI Court issued by Judge Bannister that was filed with the Bankruptcy Court as an exhibit attached to the Kite Declaration. (*See* Kite Decl. Ex. B.)

Each side appealed the BVI Court's decision to the Eastern Caribbean Court of Appeal (the "ECCA").  *See Fairfield II*, 596 B.R. at 287.  The ECCA affirmed the BVI Decision.  *Id.* (citing *Quilvest Fin. Ltd. v. Fairfield Sentry Ltd. (In Liquidation)*, Nos. HCVAP 2011/041, *et al*.)  With regard to the Good Consideration Issue, the ECCA found that upon receiving redemption requests from members, Sentry was obligated to redeem the shares based on the NAV as calculated by Citco.  *Id.*  Specifically, the ECCA stated that

> It is simply not open to Sentry to recover the redemption prices which it paid for the purchase of the redeemed shares because it has now been discovered that it determined its NAV on unreliable or erroneous information from BLMIS which had nothing to do whatsoever with any of Sentry's shareholders.  The shareholders fully performed all their obligations under the contract.  Sentry, in paying the redemption price, did so in the discharge of its debt obligations to the redeeming shareholders pursuant to Sentry's Articles which remained perfectly valid and in force.

(ECCA Decision ¶ 87.)[16]

### 3.  Migani

The ECCA decision was appealed to the Judicial Committee of the Privy Council in London (the "Privy Council"),[17] *see Fairfield II*, 596 B.R. at 287–88, which then issued *Migani*, [2014] UKPC 9, 2014 WL 1219748 (2014).[18]  In *Migani*, the Privy Council rejected the Liquidators' argument that New York law, which governs the Subscription Agreement, should govern the issues on appeal.[19]  *Id.* ¶ 20.  The Privy Council found instead that the Liquidators' claims "ar[ose] out of a transaction governed by the Articles," and therefore should be "governed

---

[16] "ECCA Decision" refers to the decision of the ECCA (the relevant portion written by Pereira, J.) that was filed in the Bankruptcy Court as an exhibit attached to the Kite Declaration.  (*See* Kite Decl. Ex. G.)

[17] The Privy Council is the highest court for the BVI and other British Overseas Territories.  (Open. Br. I 7.)

[18] A full text of the *Migani* opinion was filed in the Bankruptcy Court as an exhibit to the Hare Declaration.  (Hare Decl. Ex. Q.)

[19] Section 16 of the Subscription Agreement provides that its terms are governed by New York law.  (*See* Subscription Agreement § 16.)

by the same law which governs the Articles themselves," which is the BVI law.  *Id.* ¶ 17.  The

Privy Council also observed that "none of the questions raised by the preliminary issues depends

on the Subscription Agreement."  *Id.* ¶ 20.

      The Privy Council then found that the Certification Issue and the Good Consideration

Issue were "closely related and have to be considered together," because whether the Redeemers

had exchanged good consideration for those shares "depends on whether [the Funds were] bound

by the [effect of] the redemption terms," i.e. the effects of the alleged "certificates" and the

NAVs issued with them.  *Id.* ¶¶ 6, 19.  The Privy Council proceeded to reverse the lower courts'

decision on the Certification Issue, finding that the communications from Sentry to the

Redeemers were "certificates" within the meaning of Article 11, which meant that the NAV as

determined by Citco was binding.  *Id.* ¶¶ 21–23.  The Privy Council based its reasoning on the

need for finality and certainty in securities transactions.  Specifically, it dismissed the

Liquidators' argument—that the NAV issued at the time was not binding due to mutual

mistakes—as "an impossible construction," and reasoned that:

> If [the Liquidators] were correct, an essential term of both the subscription for
> shares and their redemption, namely the price, would not be definitively ascertained
> at the time when the transaction took effect, nor at the time when the price fell to
> be paid.  Indeed, it would not be definitively ascertained for an indefinite period
> after the transaction had ostensibly been completed, because unless a certificate
> was issued it would always be possible to vary the determination of the NAV per
> share made by the Directors at the time and substitute a different one based on
> information acquired long afterwards about the existence or value of the assets.
> This would not only expose Members who had redeemed their shares to an open-
> ended liability to repay part of the price received if it subsequently appeared that
> the assets were worth less than was thought at the time.  It would confer on them
> an open-ended right to recover more (at the expense of other Members) if it later
> appeared that they were worth more.
>
> . . . .
>
> If, as the Articles clearly envisage, the . . . Redemption Price are to be definitively
> ascertained at the time of the . . . redemption, then the NAV per share on which

those prices are based must be the one determined by the Directors at the time, whether or not the determination was correctly carried out in accordance with Articles 11(2) and (3).

(*Id*. ¶¶ 23–24.)

Accordingly, the Privy Council dismissed the appeal on the Good Consideration issue.[20] Since the NAV was binding, the Redeemers were entitled in the first place to receive the Redemption Payments as calculated based on the erroneous NAV, which means that there was no unjust enrichment.  *Id*. ¶ 18 (noting that "[t]he payee of money cannot be said to have been unjustly enriched if he was entitled to receive the sum paid to him" (internal quotation marks omitted)).

**B.  *The U.S. Proceedings***

Concurrently with the BVI Proceedings, Plaintiffs-Appellants filed about 300 actions in the United States to claw back over $6 billion worth of inflated Redemption Payments from Defendants-Appellees (the "U.S. Proceedings").[21]  In June 2010, Plaintiffs-Appellants commenced ancillary proceedings before the Bankruptcy Court to obtain recognition of the BVI Proceedings as "foreign main proceedings" under Chapter 15, specifically §§ 1502, 1515, and 1517 of the Bankruptcy Code.[22]  *See In re Fairfield Sentry Ltd*., No. 10-13164 (SMB), 2018 WL

---

[20] Under the BVI law, a dismissal of an appeal leaves the lower court ruling in effect.  (Doc. 281 ("Con. Br. I"), at 15 n.21.)

[21] Defendants in the BVI Proceedings and the U.S. Proceedings partially overlapped.  (Con. Br. I 5 n.3.)  The parties agree that the claims asserted in the U.S. Proceedings are not the same as those asserted in the BVI Proceedings, as they involved different redemption transactions at different time periods.  *See Fairfield II*, 596 B.R. at 291 ("The parties concede that the claims asserted in the U.S. Redeemer Actions are not the same claims that were asserted in *Migani*."); (*see also* Open. Br. I 17).

[22] A foreign main proceeding is a proceeding "pending in the country where the debtor has the center of its main interests."  11 U.S.C. § 1517(b)(1).  "Upon recognition of a foreign main proceeding, Section 1520 provides certain automatic, nondiscretionary relief, including an automatic stay of all proceedings against the debtor in the United States."  *In re Fairfield Sentry Ltd*., 714 F.3d 127, 133 (2d Cir. 2013) (citing 11 U.S.C. § 1520(a)).  The ancillary proceedings, on the other hand, "bring people and property beyond the foreign main proceeding's jurisdiction into the foreign main proceeding through the exercise of the United States' jurisdiction."  *In re ABC Learning Ctrs. Ltd*., 728 F.3d 301, 306–07 (3d Cir. 2013).

3756343, at *2 (Bankr. S.D.N.Y. Aug. 6, 2018) ("*Fairfield I*").  In July 2010, the Bankruptcy Court granted Plaintiffs-Appellants' application.  *Id.*  After the grant of that application, all cases filed by the Plaintiffs-Appellants were consolidated before the Bankruptcy Court.  *See Fairfield II*, 596 B.R. at 282.

Plaintiffs-Appellants asserted the following causes of action:  (1) unjust enrichment; (2) money had and received; (3) mistaken payment; (4) constructive trust (collectively, the "BVI Common Law Claims" or "Common Law Claims"); (5) unfair preferences under BVI's Insolvent Act § 245; (6) undervalue transactions under the Insolvent Act § 246 (collectively, the "BVI Avoidance Claims"); (7) breach of contract; and (8) breach of the implied covenant of good faith and fair dealing (collectively, the "BVI Contract Claims").  *Id.* at 289–90.  In October 2011, the Bankruptcy Court stayed the U.S. Proceedings pending the resolution of the BVI Proceedings.  *See Fairfield I*, 2018 WL 3756343, at *3.

After *Migani* was issued in 2014, the Bankruptcy Court lifted the stay.  Around the same time, Plaintiffs-Appellants obtained evidence of Citco's bad faith and moved for leave to amend their complaint accordingly.  *Id.* at *6.  Plaintiffs-Appellants sought to add allegations that Citco was aware that the NAV based on which it calculated the Redemption Price was inflated, and that such dishonesty benefitted Defendants-Appellees.  *Id.*  Defendants-Appellees opposed the motion for leave to amend, and moved to dismiss Plaintiffs-Appellants' claims in their entirety based on lack of personal jurisdiction, failure to state a claim, and under the safe harbor defense under the Bankruptcy Code § 546(e).  *Id.*  As a result of these motions, the Bankruptcy Court issued a series of opinions that gave rise to the appeals before me.

### 1.  Fairfield I

On August 6, 2018, the Bankruptcy Court issued *Fairfield I*, holding that it does not have

personal jurisdiction over certain Defendants-Appellees.  2018 WL 3756343, at *10–12.

Although the Subscription Agreement that these Defendants-Appellees entered into provided that

they would consent to jurisdiction in New York for claims "with respect to [the Subscription]

Agreement and the Fund," (Subscription Agreement § 19), the Bankruptcy Court ruled that the

Plaintiffs-Appellants' claims were not "with respect to" the Subscription Agreement.  2018 WL

3756343, at *10–12.  Specifically, the Bankruptcy Court found support for its decision in

*Migani*, where the Privy Council ruled that the Subscription Agreement was irrelevant to the two

preliminary issues.  *Id*. at *11.

### 2.  Fairfield II

On December 6, 2018, the Bankruptcy Court issued *Fairfield II*, 596 B.R. 275.  The

Bankruptcy Court rejected Defendants-Appellees' defense of collateral estoppel, finding that

Plaintiffs-Appellants' allegations of mistake made in the BVI Proceedings do not preclude them

from alleging Citco's bad faith in the U.S. Proceedings because the bad faith issue was not

actually decided.  *Id*. at 292–93.  However, relying on *Migani* and its progeny, the Bankruptcy

Court also found that Plaintiffs-Appellants cannot revisit the propriety of the NAVs after the

Funds already made the Redemption Payments, even if the NAVs were allegedly calculated in

bad faith.  *Id*. at 297.  The only exception to this ruling concerned those Defendants-Appellees

who at the time of redemption knew that the NAV was inflated (the "Knowledge Defendants");

the Bankruptcy Court allowed Plaintiffs-Appellants' constructive trust claims against these

Knowledge Defendants to proceed.  *Id*. at 295, 301.  The Bankruptcy Court also found that

Section 246 of the BVI Insolvency Act only applies to Plaintiffs-Appellants' claims against those

Defendants who at the time of redemption had reason to believe that the NAVs were inflated and

that the shares were worthless.  *Id*. at 302–05.  Finally, the Bankruptcy Court ruled that § 546(e)

of the Bankruptcy Code, which creates a safe harbor against certain avoidance claims, is applicable to the Redemption Payments that Plaintiffs-Appellants seek to avoid; however, it did not decide whether § 546(e) actually bars their avoidance claims, leaving that for further briefing.[23]  *Id*. at 315–16.

Accordingly, the Bankruptcy Court (1) granted Plaintiffs-Appellants' leave to amend the constructive trust claims against the Knowledge Defendants and the BVI Avoidance Claims against all Defendants, and (2) granted Defendants-Appellees' motion to dismiss the remainder of the claims.  *Id*.

### 3.   Denial of Leave to Further Amend

After *Fairfield II*, the parties entered into stipulated judgments (the "Stipulated Judgments" or singular "Stipulated Judgment") in each action, all approved by the Bankruptcy Court between April 2 and 17, 2019.   *See Fairfield Sentry Ltd. (In Liquidation) v. Theodoor GGC Amsterdam*, No. 10-ap-03496 (SMB), 2020 WL 4813565, at *3.  The Stipulated Judgments were not identical.  In certain actions, the Stipulated Judgments permit the Plaintiffs-Appellants to amend their constructive claims against the Knowledge Defendants; however, in twelve of the proceedings (the "Twelve Actions"), the Stipulated Judgments explicitly denied Plaintiffs-Appellants' leave to amend the constructive trust claims and dismissed all Common Law Claims with prejudice.  *Id*.  In all actions, Plaintiffs-Appellants' request to certify the Stipulated Judgments for immediate appeal were granted pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.  *Id*.  Plaintiffs-Appellants subsequently filed their first round of appeals ("First Appeal"), where they appeal "[e]ach and every part of the [Stipulated Judgments] that constitutes

---

[23] The briefing was completed and resulted in the Bankruptcy Court's decision *Fairfield Sentry Ltd. (In Liquidation), et al. v. Theodoor GGC Amsterdam, et al.*, No. 10-ap-03496 (SMB), 2020 WL 7345988 (Bankr. S.D.N.Y. 2020) ("*Fairfield III*").

a final judgment." (*See* Doc. 1, at 2; *see also generally* Open. Br. I.)

On January 15, 2020, Plaintiffs-Appellants filed their motion to further amend the complaints to, among other things, assert constructive trust claims based on new knowledge allegations against the Defendants in the Twelve Actions.[24]  2020 WL 4813565, at *4.  On August 10, 2020, the Bankruptcy Court denied Plaintiffs-Appellants' leave to further amend complaints in the Twelve Actions, reasoning that their prior appeal of the dismissal of their common law claims in *Fairfield II* divested the Bankruptcy Court of jurisdiction of this issue. *Id*. at *12.

### 4.  Fairfield III

On December 14, 2020, the Bankruptcy Court issued *Fairfield Sentry Ltd. (In Liquidation), et al. v. Theodoor GGC Amsterdam, et al.*, No. 10-ap-03496 (SMB), 2020 WL 7345988 (Bankr. S.D.N.Y. 2020) ("*Fairfield III*"), which ruled that Section 546(e) bars Plaintiffs-Appellants' BVI Avoidance Claims.  Plaintiffs-Appellants then filed their second round of appeals which related to this ruling, together with the previous ruling of dismissal for lack of personal jurisdiction in *Fairfield I*, for failure to state BVI Avoidance claims in *Fairfield II*, and for lack of subject matter jurisdiction in the August 2020 order denying their leave to amend ("Second Appeal").  (*See generally* Open. Br. II.)[25]

### C.  *Appeals*

In the First Appeal, Appellants filed their opening brief on December 10, 2019.  (*See* Doc. 22.)  On March 9, 2020, Appellants filed the supplemental brief of Deutsche Bank

---

[24] In seventeen of the actions where the Stipulated Judgments allowed amendment of constructive trust claims, Plaintiffs-Appellants filed motions to supplement existing knowledge allegations against certain Knowledge Defendants.  2020 WL 4813565 at *4.  Those motions are not relevant for the appeals here.

[25] "Open. Br. II" refers to Plaintiffs-Appellants' Opening Brief filed in their second round of appeals.  (Doc. 440.)

(Cayman) Limited, (Doc. 253 ("Supp. Br. I")); Appellees filed (1) the supplemental brief of

certain Appellees seeking affirmance based on the doctrine of res judicata, (Doc. 266 ("Supp. Br.

II")), and (2) their consolidated brief in opposition, (Doc. 281 ("Con. Br. I")).  Appellants filed

their reply brief on April 23, 2020.  (Doc. 361 ("Reply I").)  Appellants' reply brief to the

supplemental brief of Deutsche Bank (Cayman) Limited, (Doc. 360 ("Supp. Rep. I")), and

Appellees' reply brief to the supplemental brief of certain Appellees seeking affirmance based on

the doctrine of res judicata, (Doc. 359 ("Supp. Rep. II")), were both filed on the same day.

In the Second Appeal, Appellants filed their Opening Brief on July 21, 2021.  (Doc. 440.)

Appellees filed their consolidated brief in opposition on October 19, 2021.  (Doc. 510 ("Con. Br.

II")).  Appellants' brief was filed on December 3, 2021.  (Doc. 531 ("Reply II").)

### III.   Standard of Review

A district court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1) to hear appeals from

final judgments, orders, and decrees of a bankruptcy court.  On such an appeal, the district court

reviews the bankruptcy court's findings of fact for clear error, and any conclusions of law de

novo.  *See In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994).

In reviewing a decision of a bankruptcy court, the district court "may affirm on any

ground that finds support in the record, and need not limit its review to the bases raised or relied

upon in the decisions below."  *Freeman v. Journal Register Co.*, 452 B.R. 367, 369 (S.D.N.Y.

2010).  The district court may not consider evidence outside the record.  *See In re Bear Stearns

High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 339 (S.D.N.Y. 2008).

Any arguments not raised in the bankruptcy court are considered waived; unless such a waiver

results in manifest injustice, the new arguments will not be considered on appeal.  *See In re

Barquet Grp., Inc.*, 486 B.R. 68, 73 n.3 (S.D.N.Y. 2012); *In re Lionel Corp.*, 29 F.3d 88, 92 (2d

Cir. 1994).

IV.   **Discussion**

A.   *Personal Jurisdiction*

Appellants argue that the choice of forum clause in the Subscription Agreement establishes personal jurisdiction over 206 of the Defendants.[26]  (*See* Open. Br. II 53.)  Because personal jurisdiction is a threshold issue that must be addressed prior to the merits, *In re Rationis Enters. of Pan.*, 261 F.3d 264, 267–68 (2d Cir. 2001), I turn to this issue first.

The Bankruptcy Court ruled that it does not have personal jurisdiction over these Defendants for several reasons.  It first found that the language "with respect to the Agreement and the Fund" should be read conjunctively, which means that for Defendants to be subject to New York jurisdiction, the claim must be related to both the Subscription Agreement and the Funds.  *Fairfield I*, at *10.  The Bankruptcy Court then found that Appellants' actions are only "with respect to" the Fund, not to the Subscription Agreement.  *Id.* at *11.  In doing so, the Bankruptcy Court relied on *Migani*, where the Privy Council found that the preliminary issues were governed by the Articles, and that the Subscription Agreement was irrelevant.  *Id.*

Appellants argue that the Bankruptcy Court erred in relying on *Migani*, because the Privy Council did not consider all of the claims in the action, but only the two preliminary issues.  (*See* Open. Br. II 55.)  They further argue that their claims are "plainly related to the [S]ubscription [A]greements" because (1) the Subscription Agreement was the basis of the contractual relationship between the parties, and expressly incorporated all other Fund documents, and (2) the clause uses the term "with respect to" instead of "arise from" or "depend on," suggesting the

---

[26] Appellants also asserted personal jurisdiction over these Defendants based on purposeful availment, but the Bankruptcy Court has not ruled on that issue yet.  (Open. Br. II 53 n.12.)

broad scope of claims applicable to this provision.  (*Id*. at 54–56 (internal quotation marks omitted).)  Appellants also argue that, in any event, the "and" in the clause should be read disjunctively, which would mean that the relevant Defendants are subject to New York jurisdiction as long as the claims are "with respect to" the Funds.  (*Id*. at 57–58.)  On the other hand, the Appellees urge me to affirm the Bankruptcy Court's rulings because the "and" should be read conjunctively and the issues here are not "with respect to" the Subscription Agreement. (Con. Br. II 41–47.)  The parties do not dispute that New York law should govern the contractual interpretation here.  (*See* Open. Br. II 57; Con. Br. II 46–47.)

Under New York law, "[t]o determine the terms of a contract, a court must ascertain the parties' intent based on the language they used." *AIG Europe (Netherlands), N.V. v. UPS Supply Chain Sols., Inc.*, 765 F. Supp. 2d 472, 479 (S.D.N.Y. 2011) (citing *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573 (2d Cir. 1993)).  As a threshold matter, the court looks at "whether the contract is ambiguous."  *Sunbelt Rentals, Inc. v. Charter Oak Fire Ins. Co*., 839 F. Supp. 2d 680, 687 (S.D.N.Y. 2012) (citing *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011)).  A contract is ambiguous if it contains language that is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Brass v. Am. Film Techs., Inc*., 987 F.2d 142, 149 (2d Cir. 1993) (citation omitted).  Ambiguity does not arise from "[s]training a contract's language beyond its reasonable and ordinary meaning."  *Id*.  "When a contract is unambiguous, it must be enforced according to the plain meaning of its terms."  *Sunbelt Rentals*, 839 F. Supp. 2d at 687 (internal quotation marks omitted).  A contract "must be read as a whole, and if possible, courts must interpret them to

effect the general purpose of the contract." *Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005).

Here, after examining the language and context of the choice of forum clause, I find that it does not establish personal jurisdiction over the relevant Appellees. Specifically, I agree with the Bankruptcy Court's determination that the word "and" should be read conjunctively, and that the claims here are not "with respect to" the Subscription Agreement.

### 1. Interpreting the Word "And"

Courts may interpret the term "and" to have a conjunctive or disjunctive meaning, depending on the context in which the term is used. *See Consumer Fin. Prot. Bureau v. RD Legal Funding, LLC*, 332 F. Supp. 3d 729, 766–67 (S.D.N.Y. 2018); *Spanski Enters. v. Telewizja Polska S.A.*, 832 F. App'x 723, 725 (2d Cir. 2020) ("[I]t may be found that 'and' includes 'or' or that 'or' includes 'and,' as a reasonable construction requires." (citing 22 N.Y. Jur. 2d Contracts § 240)). Appellants argue that the word "and" as used here has a disjunctive meaning because New York courts have held that "where nothing on the face of a document shows that a literal construction of the word 'and' was intended, courts interpret 'and' disjunctively." (Open. Br. II 57 (citing to *Lamborn v. Nat'l Park Bank of N.Y.*, 208 N.Y.S. 428, 434 (1st Dep't. 1925) and *Murphy v. Long Island Oyster Farms, Inc.*, 491 N.Y.S.2d 721, 722 (2nd Dep't. 1985).) The two cases Appellants cite, however, addressed situations materially different from this case and are distinguishable and thus not controlling.

In *Lamborn*, the parties contracted for a shipment of goods which was to be delivered in "August and September;" subsequently, there was a request to change the terms from "August and September" to "August and/or September." 208 N.Y.S. 428, 434. The court found that the requested revision was "superfluous" and did nothing to change the meaning of the terms,

because in either case, the buyer was bound to receive the shipment as long as it arrived before the end of September.  *Id*. at 434–35.  In ruling so, the court observed that "'[a]nd' is considered also as 'or' unless the document shows on its face that the word 'and' is to be literally construed."  *Id*.

The *Murphy* case concerns a dispute between a landlord and a tenant over a lease which granted the tenant the right to use the underwater lands for "planting, growing, and cultivating thereon and recovery therefrom oysters and other shellfish."  491 N.Y.S.2d 721, 722.  The landlord argued that, under the lease, the tenant has no right to harvest naturally grown shellfish because the "and" should be read conjunctively.  *Id*.  The court disagreed.  Citing to *Lamborn*, it found that "[n]othing on the face of this document shows that a literal construction of the word 'and' was intended," and that it should be read disjunctively."  *Id*.

In these two cases, "and" was interchangeable with "or" because the language of the contracts indicated that "and" was intended to draw a permissive scope within which the party may choose to act.  In *Lamborn*, the seller was allowed to ship the goods in August or September; exactly which month is up to the seller to decide.  208 N.Y.S. 428, 434.  In *Murphy*, the tenant was allowed to "plant[], grow[], and cultivat[e]" and "recover[]" the shellfish from the underwater land; they could cultivate the shellfish but not recover, or recover them but not cultivate, or do both, or do neither.  491 N.Y.S.2d 721, 722.  Nothing in the two contracts indicated that the "and" should be construed literally.  *See also S. Telecom Inc. v. ThreeSixty Brands Grp., LLC*, 520 F. Supp. 3d 497, 513 (S.D.N.Y. 2021) (finding "and" to have disjunctive meaning where the agreement provided that certain approval from a licensor "may be based solely on its subjective standards . . . and may be withheld in Licensor's sole discretion").

In addition, even where the contract seems to prescribe a permissive scope, the word

"and" may still be interpreted conjunctively if, elsewhere in the contract, a different term was used to indicate a disjunctive meaning.  *See*, *e.g.*, *Spanski Enters.*, 832 F. App'x at 725 (in the provision "[the licensor] and [the licensee] may extend its term by subsequent 10-year periods," finding the "and" to be conjunctive—i.e. the power to extend is not unilateral but would require the agreement of both—because elsewhere when the contract referred to unilateral rights, it used "each party" instead).

Here, the choice of forum provision of the Subscription Agreement does not prescribe a permissive scope within which the parties can chose freely.  Instead, it provides that if claims are brought "with respect to the Agreement and the Fund," the members must agree to New York's jurisdiction.  In other words, the provision protects the members' expectation by specifically naming the type of claims that will drag them into New York.  This alone goes against following the disjunctive interpretation in *Lamborn* and *Murphy*.  *See* 208 N.Y.S. 428; 491 N.Y.S.2d 721. Moreover, in other parts of the Subscription Agreement, the parties repeatedly use "or" or "and/or" to show disjunctive meaning.  (*See* Subscription Agreement ¶ 8 ("Subscriber has obtained sufficient information from the Fund or its authorized representatives to evaluate such risks"; "All information which the Subscriber has provided to the Fund or the Administrator concerning the Subscriber . . . is correct and complete as of the date set forth herein"; "[t]he Subscriber irrevocably authorizes the Fund and/or the Administrator to disclose, at any time, any information held by the Fund or the Administrator in relation to the Subscriber or his investment in the Fund to the Investment Manager"); *id.* ¶ 19 ("Subscriber consents to the service of process out of any New York court in any such Proceeding by the mailing of copies thereof, by certified or registered mail").)  Those provisions indicate that the "and" in the choice of forum clause is unambiguously used in its "usual conjunctive meaning," *Spanski Enters.*, 832 F. App'x at 725, as

21

it imposes a mandatory scope where both conditions must be satisfied.

Appellants argue that such a reading would lead to the "absurd" result where "disputes 'with respect to' the agreements but not 'with respect to' the Funds . . . would be litigated outside of New York, whereas disputes 'with respect to' both the agreements and to the Funds would be litigated in New York."  (Open. Br. II 58.)  I disagree.  In fact, as the Bankruptcy Court correctly recognized, because the Subscription Agreement regulates the investment relationship between the members and the Funds, any dispute over the Subscription Agreement is necessarily also "with respect to the Fund."  *Fairfield I*, at *10.  Reading "and" disjunctively would render part of the provision superfluous, and in New York "[i]nterpretations that render provisions of a contract superfluous are particularly disfavored."  *Spinelli v. NFL*, 903 F.3d 185, 200 (2d Cir. 2018) (internal quotation marks omitted.)  Therefore, the Bankruptcy Court was correct to read "and" conjunctively.

Accordingly, for the relevant Appellees to be subject to New York jurisdiction, Appellants' claims must be "with respect to" both the Subscription Agreement and the Funds.

### 2.   "With Respect to"

In deciding whether Appellants' claims are "with respect to" the Subscription Agreement, I first note that *Migani* does not control.  First, *Migani* did not address the issue of choice of forum, only choice of law, which is governed by a different clause under the Subscription Agreement.[27]  *See Migani*, ¶ 20 ("[The counsel for the Fund] suggested that at a further hearing in the High Court, New York law, which is the proper law of the Subscription Agreement, might be relevant.  The Board unhesitatingly rejects these submissions.").[28]  Second, *Migani* only

---

[27] *See infra* n.20.

[28] In ruling that BVI law should apply, the Privy Council noted that the questions raised by the preliminary issues did not "depend[] on" the terms of the Subscription Agreement.  *Id.* The choice of forum clause, however, provides that the claims must be "with respect to" the Agreements; it did not use the more limited "depends on."  A

concerned the preliminary issues raised as potential defenses to the common law claims raised in the BVI Proceedings.  It did not address all of the claims raised by Appellants in the current U.S. Proceedings.

In the U.S. Proceedings, Appellants brought common law claims, BVI Avoidance Claims, and BVI Contract Claims, all under the theory that Citco's bad faith rendered the redemption price fraudulently inflated.  Appellants do not dispute that the issues related to the NAV and the Redemption Payments here are governed by the Articles, which set out the procedure for NAV calculation and redemption.  (*See* Open. Br. II 55.)  Aside from the forum selection clause at issue, Appellants do not mention any other specific provision of the Subscription Agreement they believe are implicated by their claims.  Although the Subscription Agreement mentions "redemption," it only very briefly notes the existence of the "limited provisions for redemptions" in other documents like the Articles, and a very general description of the timing of the redemption payments.  (Subscription Agreement § 9.)  It does not mention the NAV or the NAV calculation, nor does it mention the standard under which the NAV, NAV calculation, or the information used in connection with the NAV are provided.  The limited references contained in the Subscription Agreement do not warrant bringing these agreements into the analysis for purposes of the forum selection clause.  The Subscription Agreement simply contains no provision that is relevant enough to make this dispute "with respect to" them.

I reject Appellants' argument that their claims are "with respect to the Subscription

---

claim that does not "depend on" the Agreements may well be "with respect to" them. *See Redhawk Holdings Corp. v. Invs*, 2016 U.S. Dist. LEXIS 84524, at *14 (S.D.N.Y. June 24, 2016) (referring to forum selection terms terms such as "arise out of," "arise from," or "arising under," as "narrow," while referring to terms such as "in connection with," "relating to," "with respect to," "with reference to," or "associated with" as "broad").  However, the Privy Council went on to state that the questions raised by the preliminary issues "depend wholly on the construction of the Articles, which is governed by the law of the British Virgin Islands."  *Migani*, ¶ 20.  In other words, the terms of the Subscription Agreement were not implicated.

Agreement" because the Subscription Agreement was "the basis of the contractual relationship"
between the investors and the Funds.  (*See* Open. Br. II 55 ("Defendants would have had no
shares to redeem without the [Subscription Agreement.]").)  Under that logic, almost any dispute
between the investors and the Funds would be litigated in New York, since the investors would
not have been able to make their investments at all if it were not for the Subscription Agreement.
This is clearly not what the forum selection clause intended, as it did not simply say "with
respect to the Fund," but further qualified the scope with "the Agreement."  Again, Appellants'
interpretation would render the "Agreement" in the clause superfluous, and I decline to adopt it.
*See Spinelli*, 903 F.3d at 200.

      For a similar reason, I reject Appellants' argument that their claims are "with respect to
the Subscription Agreement" because the Subscription Agreement "expressly incorporated all
other Funds documents, including the Articles that govern the legal issues in dispute here."
(Open. Br. II 55.)  First, this argument would render almost any investors' disputes subject to the
forum selection clause.  Second, under New York law, incorporation by reference in a contract
requires the allegedly incorporated document to be "expressly identified" in the contract, and that
the language "clearly communicates" the purpose of the reference is to incorporate the
referenced material into the contract.  *See Miller v. Mercuria Energy Trading, Inc.*, 291 F. Supp.
3d 509, 517 (S.D.N.Y. 2018) (internal quotation marks omitted), *aff'd*, 774 F. App'x 714 (2d Cir.
2019).  Neither requirement is met here.  The choice of forum clause never "expressly identifies"
the Articles nor "clearly communicates" the purpose of incorporation.  On the contrary, the terms
used throughout the Subscription Agreement indicate that the "Subscription Agreement" is
treated as distinct from the "Fund Documents."  When only the phrase "Subscription
Agreement" is used, it refers to the Subscription Agreement itself, not including the Articles and

other Fund Documents.  However, when the Subscription Agreement seeks to address issues related to all the Fund Documents, it uses the phrase "Fund Documents" instead.  (*Compare* ¶ 2 ("If rejected, the Fund shall promptly return the subscription funds, with any interest actually earned thereon, and this Agreement shall be void") and ¶ 8 ("Subscriber understands that . . . the representations . . . made by the Subscriber in this Agreement will be relied upon by the Fund"), *with*, ¶ 2 ("If the Fund accepts this Subscription, Subscriber shall become a shareholder of the Fund and bound by the Fund Documents.") and ¶ 5(a) ("Subscriber understands that the Fund may compulsorily repurchase such Shares in accordance with the Fund Documents.").  If the forum selection clause was meant to be "with respect to" all Fund Documents including the Articles, it would have been written to clearly state such.

Therefore, Plaintiffs-Appellants' claims are not "with respect to" the Subscription Agreement, and, accordingly, the forum selection clause cannot establish the Bankruptcy Court's personal jurisdiction over the relevant Defendants-Appellees.

## B.   *Safe Harbor Defense under § 564(e)*

Appellants have raised a number of issues on the merits.  I will first address the issue regarding Appellees' safe harbor defense under Section 546(e) of the Bankruptcy Code, because a determination that Section 546(e) bars Appellants' BVI Avoidance claims may potentially dispose of the issue related to the Bankruptcy Court's dismissal of the BVI § 246 claim for failure to state a claim, as well as the Appellees' argument that § 546(e) bars Appellants' BVI Common Law Claims.

### 1.   Avoidance

Under the Bankruptcy Code, a bankruptcy trustee is afforded powers to avoid transactions under various avoidance provisions.  *See, e.g.*, 11 U.S.C. §§ 544, 545, 547, 548.

Specifically, under § 548(a)(1)(A), the trustee can avoid any transfer that was made "with actual intent to hinder, delay, or defraud any entity to which the debtor was . . . indebted." 11 U.S.C. § 548(a)(1)(A). Such avoidance powers, however, have limitations. Section 546(e) provides for certain transactions a safe harbor from the trustees general avoiding power. *See Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 893 (2018). Under § 546(e), a trustee may not avoid a transfer that is a "settlement payment . . . made by or to (or for the benefit of) . . . a financial institution . . . in connection with a securities contract . . . except under Section 548(a)(1)(A) of this title." 11 U.S.C. § 546(e). In other words, a transaction qualified under § 546(e) as a "settlement payment . . . made by or to (or for the benefit of) a . . . financial institution . . . in connection with a securities contract" (i.e. a "Qualified Transaction") falls under the safe harbor and cannot be avoided by a trustee; however, such a Qualified Transaction will not be able to benefit from the safe harbor if the transfer was made "with actual intent to hinder, delay, or defraud," § 548(a)(1)(A).

Section 546(e) was designed to protect against the "displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." *In re Enron Creditors Recovery Corp.*, 651 F.3d 329, 334 (2d Cir. 2011). "If a firm is required to repay amounts received in settled securities transactions," it might fail to "meet its current securities trading obligations," whereby "placing other market participants and the securities markets themselves at risk," potentially leading to a systemic disruption. *Id.*; *see also In re Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d 98, 120–21 (2d Cir. 2016) (explaining that § 546(e)'s "larger purpose . . . was to promote finality and certainty for investors, by limiting the circumstances, e.g., to cases of intentional fraud, under which securities transactions could be unwound") (internal quotation marks omitted).

Chapter 15 of the Bankruptcy Code was enacted "to provide effective mechanisms for dealing with cases of cross-border insolvency, while promoting international cooperation, legal certainty, fair and efficient administration of cross-border insolvencies, protection and maximization of debtors' assets, and the rescue of financially troubled businesses." *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 132 (2d Cir. 2013) (internal quotation marks omitted).  It allows a "foreign representative" to seek assistance in the United States in connection with a foreign bankruptcy proceeding by commencing an ancillary proceeding for recognition of a foreign proceeding before a United States bankruptcy court.  11 U.S.C. §§ 1501(b)(1), 1504.  However, under 11 U.S.C. § 1521, the court in a Chapter 15 case cannot grant any relief under various avoidance provisions under the Bankruptcy Code, including §548.  In other words, foreign representatives cannot seek to avoid transfers under the United States bankruptcy law.  *In re Fairfield Sentry Ltd.*, 458 B.R. 665, 675–76 (S.D.N.Y. 2011) (explaining that "Chapter 15 merely gives the foreign representatives standing to use the United States courts to assert claims under law other than Chapter 15," and "the causes of action asserted here are not created by Chapter 15.")  It has been suggested that the rationale behind this approach was to prevent forum shopping.  *See In re Condor Ins. Ltd.*, 601 F.3d 319, 327 (5th Cir. 2010) (explaining that, otherwise, "foreign representatives would bring an ancillary action simply to gain access to avoidance powers not provided by the law of the foreign proceeding"). Nevertheless, a foreign representative can bring avoidance claims under foreign laws, as Appellants have done here.  *See In re Bankr. Estate of Norske Skogindustrier ASA*, 629 B.R. 717, 757 (Bankr. S.D.N.Y. 2021) ("[C]ourts have recognized that section 1521(a)(7) does not prevent a foreign representative from bringing avoidance claims under foreign law." (citing *In re Condor*, 601 F.3d 319)); *In re Fairfield Sentry Ltd.*, 458 B.R. at 675 ("Chapter 15 . . . does not

prohibit the application of the law as provided by the other sovereign.").

Although a foreign representative cannot raise avoidance claims under the United States Bankruptcy Code, its avoidance power under foreign law in a Chapter 15 proceeding is nevertheless subject to the Bankruptcy Code's limitations.  Specifically, § 561(d) extends the § 546(e) safe harbor to claims raised by a foreign representative by providing that

> Any provisions of this title relating to securities contracts, commodity contracts, forward contracts, repurchase agreements, swap agreements, or master netting agreements shall apply in a case under chapter 15, so that enforcement of contractual provisions of such contracts and agreements in accordance with their terms will not be stayed or otherwise limited by operation of any provision of this title or by order of a court in any case under this title, and to limit avoidance powers to the same extent as in a proceeding under chapter 7 or 11 of this title (such enforcement not to be limited based on the presence or absence of assets of the debtor in the United States).

11 U.S.C. § 561(d).

### 2.  The Redemption Payments and § 561(b)

On appeal, Appellants do not dispute that the Redemption Payments they seek to avoid are Qualified Transactions under § 564(e); instead, they argue that the safe harbor cannot be applied to the Redemption Payments because they are foreign transactions.  (*See* Open. Br. II 24.)  Pointing to the doctrine of presumption against extraterritoriality—"[w]hen a statue gives no clear indication of an extraterritorial application, it has none," *Morrison v. Nat'l Aus. Bank Ltd.*, 561 U.S. 247, 255 (2010)—Appellants argue that Congress has demonstrated no indication to apply § 546(e) to extraterritorial transactions like the Redemption Payments.  (*See* Open. Br. II 25–27.)  On the other hand, Appellees do not challenge that the Redemption Payments were purely foreign transactions, or that Congress has expressed no intention to apply Section 546(e) extraterritorially.  Instead, relying on *Force v. Facebook, Inc.*, 934 F.3d 53, 73 (2d Cir. 2019), Appellees argue that applying the safe harbor in a United States court is a domestic application

of the statute that does not implicate the presumption against extraterritoriality, even if the transaction at issue took place overseas.  (*See* Con. Br. II 14–15.)

### a.   "To the Same Extent"

As an initial matter, I agree with the Bankruptcy Court that the issue here is not whether the safe harbor under § 546(e) applies extraterritorially, but whether § 561(b) makes the § 546(e) safe harbor applicable to extraterritorial transactions like the Redemption Payments.  *See Fairfield II*, 596 B.R. at 310 ("Asking whether section 546(e) applies is the wrong question."). However, Appellants seem to suggest that it is sufficient to examine § 546(e) alone, because § 561(b) does nothing to expand the territorial scope of § 546(e).  (*See* Open. Br. II 27–34.) Appellants' argument is based on the language of § 561, which specifies that the avoidance powers of a Chapter 15 foreign representative are "limit[ed] . . . to the same extent" as those of a domestic bankruptcy trustee.  11 U.S.C. § 561(d).  By allowing the safe harbor to "prohibit avoidance of both foreign and domestic transfers in Chapter 15 cases, but bar the avoidance of only domestic transfers in Chapter 7 and Chapter 11 cases," Appellants argue, the Bankruptcy Court "impermissibly expand[ed] the substantive reach of Section 546(e) in Chapter 15 proceedings."  (Open. Br. II 29.)  Appellants misconstrue the language at issue.  Limitation on the powers "to the same extent" does not mean that the scope of a foreign representative's avoidance powers will be exactly the same as those of a domestic trustee.  The scope of the avoidance powers of a foreign representative are by nature different from those of a domestic trustee.  As explained above, while a domestic trustee is afforded avoidance powers by the Bankruptcy Code under provisions like § 548, the same is not afforded to a foreign representative, who, in a Chapter 15 proceeding, can only bring avoidance claims outside of the Bankruptcy Code, e.g., under foreign avoidance laws.  *See also In re Fairfield Sentry Ltd.*, 458

B.R. at 675–76.  Therefore, by imposing limitation on the power of a foreign representative "to

the same extent" as bankruptcy trustee, § 561(b) does not mean that the two share the same set of

avoidance powers or that the powers will have the same territorial reach, but simply that the

foreign representative's powers will be limited in the same way that those of a domestic trustee

are limited—for example, neither can avoid transfers with certain features, particularly those

specified under § 546(e).

Accordingly, I will turn to § 561(b) to resolve the issue.

b.  Extraterritoriality

The presumption against extraterritoriality is a "longstanding principle of American law";

it instructs that "legislation of Congress, unless a contrary intent appears, is meant to apply only

within the territorial jurisdiction of the United States."  *EEOC v. Arabian Am. Oil Co.*, 499 U.S.

244, 248 (1991) ("*Aramco*") (internal quotation marks omitted), *accord RJR Nabisco, Inc. v.*

*European Cmty.*, 579 U.S. 325, 337 (2016).  The presumption "serves to protect against

unintended clashes between our laws and those of other nations which could result in

international discord."  *Aramco*, 499 U.S. at 248.  The courts apply "a two-step framework for

analyzing extraterritoriality issues."  *RJR Nabisco*, 579 U.S. at 337.  "At the first step, we ask

whether the presumption against extraterritoriality has been rebutted—that is, whether the statute

gives a clear, affirmative indication that it applies extraterritorially."  *Id*.  If the statute is not

extraterritorial on its face, then "at the second step we determine whether the case involves a

domestic application of the statute, and we do this by looking to the statute's 'focus.'"  *Id*.  "The

focus of a statute is the object of its solicitude, which can include the conduct it seeks to regulate,

as well as the parties and interests it seeks to protect or vindicate."  *WesternGeco LLC v. ION*

*Geophysical Corp.*, 138 S. Ct. 2129, 2137 (2018) (internal quotation marks omitted).  "If the

conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad . . ." *RJR Nabisco*, 579 U.S. at 337.  "[B]ut if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory."  *Id.*  Finally, although "a finding of extraterritoriality at step one will obviate step two's 'focus' inquiry," courts may instead "start[] at step two in appropriate cases."  *Id.* at 338 n.5.

After examining the statute, I find that the presumption against extraterritoriality does not bar the application of § 546(e) to Appellants' claims because (1) Congress has expressed a clear intent to apply § 546(e) extraterritorially through § 561(b), and (2) even if there were no such Congressional intent, the application of § 546(e) here is a domestic one that passes step two of the test.

Section 564(e) is a safe harbor provision, and safe harbor provisions, by implication, should apply to the same extent as the underlying provision.  *See*, *e.g.*, *Merit Mgmt.*, 138 S. Ct. at 893 (describing avoidance powers and safe harbors as "two sides of the same coin") (internal quotation marks omitted); *see also Fairfield II*, 596 B.R. at 310 n.49.  Appellants themselves admit that the safe harbor applies extraterritorially to the same extent as do the avoidance powers.  (*See* Open. Br. II 27.)  However, in arguing that the safe harbor does not apply extraterritorially, Appellants mistakenly look to the avoidance powers of a domestic trustee, instead of to the powers of a foreign representative.  For example, they cite a number of cases where, in a Chapter 7 or 11 proceeding, courts found that § 546(e) does not apply extraterritorially.  *See, e.g.*, *In re Zetta Jet USA, Inc.*, 624 B.R. 461, 490 (Bankr. C.D. Cal. 2020) (Chapter 7 and Chapter 11); *In re Maxwell Commun. Corp. PLC*, 186 B.R. 807, 812 (S.D.N.Y.

1995) (Chapter 11).  However, Appellants, as foreign representatives, do not have the power to

bring avoidance claims under the Bankruptcy Code as the domestic trustees in those cases did.

Instead, Appellants should have looked at the foreign representatives' avoidance power under

Chapter 15.

Under Chapter 15, there is no specific provision authorizing a foreign representative to

bring avoidance claims.  Nevertheless, Chapter 15 authorizes the foreign representative to

"commence a case [for ancillary proceedings] by filing directly with the court a petition for

recognition of a foreign proceeding," 11 U.S.C. § 1509(a), and provides that, "upon recognition

of a foreign proceeding," "the court may . . . grant any appropriate relief," except the avoidance

relief under provisions like § 548, 11 U.S.C § 1521(a).  As noted above, courts have read these

provisions to authorize foreign representatives to bring avoidance claims under the foreign laws.

*See, e.g.*, *In re Fairfield Sentry Ltd.*, 458 B.R. at 675–76; *In re Condor*, 601 F.3d at 327.  Chapter

15 does not prohibit avoidance claims for foreign transfers.  In fact, this is the very reason

Appellants can bring claims to avoid the Redemption Payments, which are purely foreign

transactions, in a U.S. Bankruptcy court.  *See In re Fairfield Sentry Ltd.*, 458 B.R. at 675–76

(noting that Chapter 15 "gives the foreign representatives standing to use the United States courts

to assert claims under law other than Chapter 15").  Since safe harbor in a Chapter 15 case will

apply extraterritorially to the same extent as the foreign representative's avoidance powers do in

a Chapter 15 case, and the foreign representative's avoidance powers reach extraterritorial

transfers, the natural conclusion is that the safe harbor from the foreign representatives'

avoidance powers applies to extraterritorial transfers as well.  Appellants cannot have it both

ways—benefiting from the domestic forum Chapter 15 has created for foreign law claims "as a

matter of comity," (Reply II 17), while trying to avoid the limitations that Chapter 15 imposes on

their power to bring these claims.  Moreover, if the safe harbor does not apply extraterritorially, then the avoidance powers of a foreign representative would not be "limit[ed] . . . to the same extent" as a bankruptcy trustee:  the foreign representatives' avoidance powers would be limited only with regard to a portion of the claims it can bring—claims involving domestic transfers—while the bankruptcy trustee's avoidance powers would be limited with regard to all claims it can bring.  *See* 11 U.S.C. § 561(d).

Such a conclusion is also consistent with the ruling of *Force*, 934 F.3d 53.  In *Force*, the family members of the victims of a terrorist organization sued Facebook under 18 U.S.C. § 2333 for aiding and abetting terrorism and conspiracy for publishing terrorism-related content on its website.  *Id.* at 61.  Facebook raised an affirmative defense under 47 U.S.C. § 230(c)(1), a provision under the Communications Decency Act of 1996.  *Id.*  Section 230(c)(1) provides that internet service providers like Facebook "shall [not] be treated as the publisher or speaker of any information provided by" its users.  The plaintiffs argued that Section 230(c)(1) does not apply to the foreign posts at issue in that case, noting the presumption against extraterritoriality.  Ruling in favor of Facebook, the Court of Appeals first cast doubt on whether the presumption against extraterritoriality is triggered at all, because "it is unclear" how an application of such a liability-limiting provision in a U.S. court is "extraterritorial[]" to begin with.  *Id.* at 73.  Moreover, even if such an application is extraterritorial, it does not run against the presumption against extraterritoriality.  This is especially true because, there, the "cause of action applies extraterritorially"—"applying the presumption to block a different provision setting out defenses to that claim, would seem only to increase the possibility of international friction."  *Id.* (noting that "[s]uch a regime could also give plaintiffs an advantage when they sue over extraterritorial wrongdoing that they would not receive if the defendant's conduct occurred domestically.")  The

Court of Appeals ultimately did not decide whether the presumption against extraterritoriality is "simply not implicated" in cases involving statutes that merely limit civil liability because it found that the two-step analysis yields the same result:  under step two, the language of § 230 indicates that "the primary purpose" of this provision "is limiting civil liability in American courts."  *Id*. at 74.  Consequently, application of the statute is merely domestic, and the presumption against extraterritoriality posed no barrier to Facebook's defense.  *Id*.

Here, similarly, Appellants' cause of action arises under the BVI avoidance law and applies to transactions outside of the United States; the "focus" of § 561(b) is to limit the foreign representative's avoidance power in the United States court.  Consequently, under *Force*, it is a domestic application that is permitted under the presumption against extraterritoriality.

Appellants attempt to demonstrate support in cases where the courts ruled that the "focus" of the Bankruptcy Codes' avoidance provisions are the transfers to be avoided, not the limitation of liability in a domestic court.  (*See* Open. Br. II 37 (collecting cases).)  However, these cases are not on point.  None of them discuss the "focus" of § 546(e) for the purpose of extraterritoriality in a Chapter 15 proceeding.  For example, *Merit Management* only discusses the "focus" of §546(e) in order to "determine how the safe harbor operates in the context of a transfer that was executed via one or more transactions."  138 S. Ct. at 888.  *In re Picard* discusses the focus of § 550 through § 548(a)(1)(A), which is a substantive avoidance provision, instead of a safe harbor provision like § 546(e) which limits the scope of the avoidance provision.  917 F.3d 85, 99–100 (2d Cir. 2019).  Although *In re Hellas Telecomms. (Lux.) II SCA*, 526 B.R. 499 (Bankr. S.D.N.Y. 2015) suggested that "it seems doubtful that Congress intended section 546(e) to apply to . . . predominantly foreign transfers," it never actually decided the issue.  In any event, that case is not binding on me, and I do not find the reasoning in

that case to be persuasive or convincing, because the court there did not consider the application of § 546(e) through the lens of § 561(d).  *See id.* at 513–14.

Appellants further argue that such a ruling would open the floodgates:  "[i]f every Code provision stating what a trustee 'may' do were always focused on domestic bankruptcy proceedings, then domestic trustees would have vast powers to avoid foreign transfers."  (Reply II 12.)  This is not correct.  The reason the safe harbor applies extraterritorially here is because it is not applied to claims brought by a domestic trustee, but a foreign representative, who has power to avoid extraterritorial transfers in United States Bankruptcy Courts.  This is completely consistent with courts' routine rulings that avoidance provisions do not reach foreign transfers in domestic proceedings.[29]

### 3.  Recovery for Redemption Payments and § 561(b) Bars

Appellants further argue that, even if Section 546(e) applies, it does not bar their BVI Avoidance claims because they have alleged that the Redemption Payments were made "with actual intent to hinder, delay, or defraud any entity to which the debtor was . . . indebted," 11 U.S.C. § 548(a)(1)(A), and therefore are under the exception to the safe harbor.  (*See* Open. Br. II 45.)  Appellees, on the other hand, argue that the text of § 546(e) is clear that only those claims brought "under Section 548(a)(1)(A)" are excepted from the safe harbor; because Appellants do not, and cannot, bring claims under §548(a)(1)(A), the Redemption Payments are not excluded from the safe harbor.  (*See* Con. Br. II 26.)  Appellees further argue that the Redemption Payments do not fall under the exception to the safe harbor because, in any case, Appellants do not bring claims made "with actual intent to hinder, delay, or defraud any entity to which the

---

[29] The parties disagree concerning the relevance of the "close-out rights" under § 561(b).  Because I arrive at my conclusion independently of any consideration of close-out rights, I do not address that issue.  In any case, Appellants concede that close-out rights are not at issue here.  (Open. Br. II 30.)

debtor was . . . indebted."  I will address each argument in turn.

a.  "Under Section 548(A)(1)(a)"

In the proceeding below, the Bankruptcy Court found that the BVI Avoidance claims do not fall under the exception to the safe harbor, as they are not claims brought "under section 548(A)(1)(a)."  The Bankruptcy Court analogized fraudulent transfer claims under foreign laws with state fraudulent transfer claims and reasoned that, because the state fraudulent transfer claims have been found to be barred by the safe harbor, the same should be true with the foreign fraudulent transfer claims.  I find such reasoning to be unconvincing.  As is noted in another Bankruptcy Court opinion, *In re Bankr. Estate of Norske Skogindustrier*, 629 B.R. 717—which grappled with the same issue but disagreed with the ruling of *Fairfield II*—analogizing foreign law claims with state law claims "sets up a strawman that is wholly inapposite."  *Id*. at 761. State law claims are barred under § 546(e) not because they do not literally fall under the § 548(A)(1)(a) exception, but because they are preempted, making the analogy inapposite.  *See In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 90 (2d Cir. 2019) (finding that § 546(e) reflects the Congressional intent to preempt state law claims).  On the other hand, federal laws like the Bankruptcy Code do not preempt foreign laws like the BVI Insolvency Act through the Supremacy Clause, nor have Appellees pointed to any indication that Congress attempts to or intended to preempt foreign law claims with § 546(e).

The language of § 561(b) suggests that the foreign representative can seek to avoid transactions made "with actual intent to hinder, delay, or defraud" under foreign laws, just like a domestic trustee would do under § 548(A)(1)(a).  As § 561(b) provides, the avoidance powers of a foreign representative are "limit[ed] to the same extent" as those of a domestic trustee.  If there are exceptions to the limitation of the domestic trustee's avoidance powers, then it should be the

same with those of the foreign representative.  Due to the 11 U.S.C. §1521 prohibition on §

548(a)(1)(A) claims in a Chapter 15 case, reading § 564(e) literally would mean that there is no

exception at all to the limitation of the foreign representative's avoidance powers.  Such a result

makes no sense, and clearly is not what Congress intended.  Consequently, I reject the

Bankruptcy Court's reasoning, and find the Appellants' claims are not barred by the language

"under § 548(a)(1)(A)."

b.   <u>"With Actual Intent to Hinder, Delay, or Defraud"</u>

However, I agree with the Bankruptcy Court's conclusion that Appellants' BVI

Avoidance claims are still barred, because they have failed to bring a fraudulent transfer claim

under the BVI law.  Specifically, Appellants only bring unfair preference claims under BVI's

Insolvent Act § 245, and undervalue transaction claims under the Insolvent Act § 246.  Neither

requires the transaction to be made "with actual intent to hinder, delay, or defraud."  §

548(a)(1)(A).  Nevertheless, Appellants argue their claims are not barred, because they have

specifically alleged that the Redemption Payments were fraudulent due to Citco's bad faith.[30]

They argue that their bad faith allegations mean that their claims meet the requirement of §

564(e), which provides that "trustee cannot avoid [qualified transfers] except for transfers

'under' section § 548(a)(1)(A)."

Appellants misread the statute.  The statute provides that "the trustee may not avoid

[Qualified Transfers] except under section 548(a)(1)(A) of this statute."  In other words, in a

Chapter 7 or Chapter 11 proceeding, if the domestic trustee avoids a transaction, the legal basis

for the exercise of this avoidance power is § 548(a)(1)(A), i.e. the transaction is to be avoided

---

[30] Under BVI law, "bad faith" and "fraud" are governed by the same criteria, making the two terms interchangeable in use.  (Open. Br. I 33 n.10.)

because it was made "with actual intent to hinder, delay, or defraud."  Similarly, when this provision applies to foreign representatives through § 561(b), the statute requires that the legal basis for the avoidance claim is fraud-related, not simply that the foreign representative has made some allegations of fraud/bad faith.  Here, if Appellants prevail on their BVI Avoidance Claims, it would be because the Redemption Payments were made with unfair preference under Insolvent Act § 245, or undervalued under Insolvent Act § 246, not because they were made "with actual intent to hinder, delay, or defraud."  Appellants do not explain how their unfair preference claims under BVI's Insolvent Act § 245 or undervalue transaction claims under the Insolvent Act § 246 contain a fraud element,[31] consequently, their claims are not excluded from the safe harbor.

Appellants challenge this reading on the ground that Congress did not use "causes of action" in § 564(e), and therefore did not intend to limit the exception to safe harbor only to "causes of action that are . . . labeled 'intentionally fraudulent transfer.'"  (Open. Br. II 42.)  Although it is true that the statute does not require that the claims be "labeled" as a "fraudulent transfer" claims, it does require that the legal basis for the avoidance is somehow fraud-related.  Otherwise, virtually any plaintiff can exploit this exception to the safe harbor by simply adding allegations of fraud while bringing their non-fraud avoidance claims, and they would not need to prove the fraud element in order to prevail on their claims.

As Appellants' claims are barred by § 564(e) through the operation of § 561(b), I need not address whether the Bankruptcy Court's dismissal of Insolvent Act § 246 on other grounds is appropriate.

### C.  *Common Law Claims*

---

[31] On the contrary, Appellants on appeal argue that the § 246 Avoidance claim do not require a scienter/knowledge element.  (*See* Open. Br. II 49–53.)

Appellants also bring the BVI Common Law claims, including unjust enrichment, and the BVI Contract Claims. The Bankruptcy Court, following the Privy Council's decision in *Migani*, found that these claims fail. *See Fairfield II*, 596 B.R. at 297. The Bankruptcy Court's decision is based on the ruling of *Migani* that the NPV issued by the Funds was binding; alternatively, Appellants, by releasing their claims to shares, provided good consideration for the Redemption Payments. *Id*. The Bankruptcy Court further found that, in any case, as Citco's bad faith is attributed to the Funds, the Funds cannot rely on its wrongdoing to recover payments for itself. On appeal, Appellants seek to distinguish their case from *Migani* by relying on *Skandinaviska Enskilda Banken AB (Publ) v Conway*, [2019] UKPC 36, 2019 WL 03429530 ("*Weavering II*"), a Privy Council case issued after the Bankruptcy Court's decision in *Fairfield II*. Appellants argue that under *Weavering II*, a fraudulently calculated NPV is not binding. (*See* Open. Br. I 33.)

Before addressing the merits of Appellants' arguments, I must resolve two threshold issues raised by Appellees: (1) that these claims are sufficiently similar to the BVI Avoidance Claims to be barred by § 546(e), (*see* Con. Br. II 33–34), and (2) Appellants are collaterally estopped from pleading that the NAV is not binding on them due to Citco's bad faith, because they have lost that issue in the BVI Proceedings, (*see* Con. Br. I 48).

### 1.  Preemption by § 546(e)

Appellees argue that the Common Law and Contract Law claims are barred by § 546(e) because they are "duplicative" of Appellants' BVI Avoidance Claims. However, the sole basis of Appellees' argument is grounded in case law where courts ruled that § 546(e) bars state common law claims. *See, e.g*., *In re Tribune*, 946 F.3d at 91 (§ 546(e) barring state fraudulent conveyance claims); *In re Nine W. LBO Sec. Litig.*, 482 F. Supp. 3d 187, 207 (S.D.N.Y. 2020) (§

546(e) barring state unjust enrichment claims); *AP Servs., LLP v. Silva*, 483 B.R. 63, 71

(S.D.N.Y. 2012) (same).  Again, a plaintiff cannot bring state law claims that are similar to the

claims under the Bankruptcy Code because the state law claims are preempted.  *See In re*

*Tribune*, 946 F.3d at 91; *see also supra* IV.A.3.a.  As explained above, that reasoning under the

Supremacy Clause does not apply to cases where, as here, Appellees are foreign representatives

and bring claims under the foreign law.  *Id*.  There is nothing to suggest that Congress intended

the Bankruptcy Code to preempt foreign common law claims.  Therefore, this argument fails.

### 2.  Preclusion

Second, Appellees argue that Appellants are precluded from claiming that the NAV was

not binding because they have litigated and lost that issue during the BVI Proceedings.

Asserting that the federal collateral estoppel rule should apply, Appellees contend that the

Liquidators knew of the allegations underlying their current "bad faith" theory but did not

present that theory before the BVI courts.  (Con. Br. I 50.)  Appellants argue that under the

choice-of-law rules in New York, the BVI preclusion law should apply, and because Appellees

do not argue preclusion under the BVI law, they have waived that issue.  (Reply I. 28 (citing to

other briefs).)  Separately, Appellees argue that the doctrine of res judicata precludes the claims

against those Defendants-Appellees who litigated the Preliminary Issues in the BVI Proceedings

(the "PI Defendants").  (*See* Supp. Br. II 5–6.)

I shall first decide which preclusion rules should apply to this issue.  On the one hand,

case law establishes that "a federal court should normally apply either federal or state law,

depending on the nature of the claim, to determine the preclusive effect of a foreign country

judgment."  *Alfadda v. Fenn*, 966 F. Supp. 1317, 1329 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 41 (2d

Cir. 1998); *see also Hurst v. Socialist People's Libyan Arab Jamahiriya*, 474 F. Supp. 2d 19, 32

(D.D.C. 2007) (noting that the prevailing practice appears to be "follow[ing] domestic rules of preclusion, whether they apply those of the applicable federal or state court.")  Appellees also point to several cases where courts determined the preclusive effect of foreign decisions under the federal preclusion law.  *See Simmtech Co. v. Citibank, N.A.*, No. 13-CV-6768 (KBF), 2016 WL 4184296, at *8 (S.D.N.Y. Aug. 3, 2016), *aff'd*, 697 F. App'x 35 (2d Cir. 2017); *CSFB HOLT LLC v. Collins Stewart Ltd.*, No. 02 CIV. 3069 (LBS), 2004 WL 1794499, at *6 (S.D.N.Y. Aug. 10, 2004).  None of these are bankruptcy cases.

On the other hand, the Court of Appeals has specifically ruled that a bankruptcy court should use state choice-of-law decisions "unless there was an important federal interest or policy concern that would justify application of federal choice of law rules[.]"  *In re Coudert Bros. LLP*, 673 F.3d 180, 188 (2d Cir. 2012) (citing *In re Gaston & Snow*, 243 F.3d 599, 607 (2d Cir. 2001)).  This is consistent with the non-bankruptcy cases cited above, where the application of the federal preclusion rule is natural because those cases involve federal claims or otherwise involve significant federal interest.  *See Alfadda*, 966 F. Supp. at 1329 (RICO claims); *Simmtech Co.*, 2016 WL 4184296, at *8 (claims against a federally-chartered corporation); *CSFB HOLT*, 2004 WL 1794499, at *6 (trademark and copyright infringement).  In contrast, courts sitting in diversity deciding state law claims generally look at state choice-of-law rules to determine the preclusive effect of foreign judgments.  *See, e.g.*, *Voreep v. Tarom Romanian Air Transp.*, No. 96 CIV. 1384 (LMM), 1999 WL 311811, at *3 (S.D.N.Y. May 18, 1999) (looking to New York choice-of-law rules to determine the preclusive effect of Romanian judgment); *Sberbank of Russia v. Traisman*, No. 3:14CV216 (WWE), 2016 WL 4479533, at *2 (D. Conn. Aug. 23, 2016) (looking to Connecticut choice-of-law rules to determine the preclusive effect of a Russian judgment).  In these cases, there was no "important federal interest or policy concern that would

justify application of federal choice of law rule." *Coudert Bros.*, 673 F.3d at 188.

Similarly, here, although Appellants brought their claims under Chapter 15, the causes of action all arise under BVI law. *In re Fairfield Sentry Ltd.*, 458 B.R. at 675–76 (explaining that "Chapter 15 merely gives the foreign representatives standing to use the United States courts to assert claims under law other than Chapter 15," and "the causes of action asserted . . . are not created by Chapter 15.")  Appellees do not point to any compelling federal interest such that federal choice of law should be applied, nor do I discern any such interests.  I agree with Appellants and find that the New York choice of law should apply.  Because the New York law looks to the jurisdiction in which judgment was rendered to determine the preclusive effect of the judgment, BVI preclusion law governs.[32]  Because Appellees do not argue preclusion under the BVI law,[33] they have waived this argument and Appellants' claims are not precluded.[34]

Similarly, Appellees' res judicata argument regarding the PI Defendants fails because Appellees fail to argue preclusion under the BVI law.  Moreover, Appellees do not raise objections to Appellants' argument, raised both before this Court and the Bankruptcy Court

---

[32] Appellees do not dispute that, if New York choice of law applies, BVI law should govern the preclusion effect.

[33] Appellees dropped a one-line footnote arguing that "[e]ven if BVI law were to apply, the Liquidators are still precluded by the BVI doctrines of issue estoppel." (Con. Br. I 48 n.36.)  This argument is not properly briefed, and, in any case, I do not consider arguments in a footnote.  *See Delaney v. Farley*, 623 F. App'x 14, 17 (2d Cir. 2015) ("Generally, we do not consider arguments raised only in footnotes."); *Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 314 (S.D.N.Y. 2015) (disregarding arguments raised in a footnote because they were not properly raised).

[34] Even if the federal collateral estoppel rule applies, Appellants' common law claims are not barred because (1) the issue of Citco's bad faith was not actually litigated in the BVI Proceedings, and (2) Appellants have demonstrated that they could not have raised the issue of Citco's bad faith prior to 2014.  As they explain, they only became aware of the evidence they now allege in 2014.  Although, as Appellees point out, Appellants alleged that Citco "acted in bad faith" in a pre-2014 litigation, *Anwar v. Fairfield Greenwich, Ltd.*, 728 F. Supp. 2d 372, 423 (S.D.N.Y. 2010), the allegations there were of a general nature.  *See id.* at 443 ("Plaintiffs allege that 'by virtue of the Citco Defendants' long-standing involvement in the Funds, and their experience in fund management, the Citco Defendants knew or were willfully blind to the fact that the due diligence and risk controls employed by the Fairfield Defendants were grossly deficient.").  In contrast, the allegations in the PAC were very specific and described how the internal concerns raised by Citco's employees were silenced by the upper management.  For the same reason, Appellants' claims do not violate the English doctrine of *Henderson v. Henderson*, which precludes a party from "raising in subsequent proceedings matters which were not, but could and should have been raised in earlier ones."  *See Fairfield II*, at 293.

below, that the BVI res judicata law does not require the Liquidators to bring all accrued

redemption claims in the BVI Proceedings.  (*See* Supp. Rep. II 10.)

### 3.  Merits

The parties do not dispute that the BVI law applies to the substance of Appellants' claims

here.  (*See* Open. Br. I 25 n.9.)  After examining the BVI law, particularly the BVI Companies

Act ("BCA"), I find that Appellants are barred from recovering the Redemption Payments.

BCA § 32 provides that

> (1) A company or a guarantor of an obligation of a company may not assert against
> a person dealing with the company or with a person who has acquired assets,
> rights or interests from the company that—
>
> . . .
>
> (e) a document issued on behalf of a company by a director, employee or agent of
> the company with actual or usual authority to issue the document is not valid or not
> genuine . . .
>
> (2) Subsection (1) applies even though a person of the kind specified in paragraphs
> (b) to (e) of that subsection acts fraudulently or forges a document that appears to
> have been signed on behalf of the company, unless the person dealing with the
> company or with a person who has acquired assets, rights or interests from the
> company has actual knowledge of the fraud or forgery.

BCA § 32.  The parties do not dispute that Citco acted as the Funds' "agent" in its function of

calculating the NAVs.[35]  Therefore, under BCA § 32(1)(e), Liquidators, now acting on behalf of

the Funds, cannot assert against those investors who received Redemption Payments that the

NAV calculated by Citco was not binding.  Further, under § 32(2), the Funds are barred even if

Citco acted fraudulently.  However, because § 32(2) allows claims against those who "ha[d]

actual knowledge of the fraud or forgery," the claims against those Appellees who at the time

were aware of the fraudulent nature of the NAV are not barred.

---

[35] Appellants also concede that Citco's bad faith is imputed to the Funds.

This result is consistent with the principle under the English doctrine of *ex turpi causa non oritur actio* ("*ex turpi*"), which "precludes a party to a contract tainted by illegality from recovering money paid under the contract from the other party under the law of unjust enrichment." *Farifield II*, at 297 (citing *Patel v. Mirza*, [2016] UKSC 42, ¶ 9.)  In other words, even if the Appellees were unjustly enriched, Appellants acting on behalf of the Funds cannot seek to recover based on the inflated NAVs issued by the Funds themselves.[36]

Appellants raised several arguments why the NAV is nonetheless binding; none of them are convincing.  First, they argue that the BCA law only bars a company from asserting that the documents were not "genuine" or "valid," but does not prohibit a company "from providing by contract the conditions to make those documents binding."  (Reply I 25.)  Pointing to the language of Article 11, which provides that NAVs "given in good faith" are binding, Appellants contend that, by implication, NAVs issued in bad faith are not binding.  (Open. Br. I 44–46.)  In other words, Appellants suggest that a company's claims will not be barred by BCA § 32(1)(e) if, under the company's own contract, the document is not binding.  This argument is not convincing.  Even assuming that under Article 11, the NAVs issued in bad faith are not binding,[37] it only addresses the legal effect of bad faith NAVs; it says nothing about Citco's authority to issue those NAVs.  Citco was authorized by the Directors to calculate the NAVs and

---

[36] Similar to the BVI doctrine of *ex turpi*, the New York doctrine of *in pari delicto* "bars a party that has been injured as a result of its own intentional wrongdoing from recovering for those injuries from another party whose equal or lesser fault contributed to the loss." *In re Lehr Constr. Corp.*, 551 B.R. 732, 739 (S.D.N.Y. 2016) (quoting *Rosenbach v. Diversified Grp., Inc.*, 85 A.D.3d 569, 570 (1st Dep't 2011)).  Courts have ruled that this doctrine applies even in a bankruptcy proceeding, where the bankruptcy trustee brings the claim. *See In re ICP Strategic Credit Income Fund Ltd.*, 568 B.R. 596, 612 (S.D.N.Y. 2017).

[37] To be exact, Article 11 only provides that NAVs given in good faith shall be binding; it says nothing about NAVs given in bad faith.  The implied term proposed by Appellants—that NAVs given in bad faith shall not be binding—is not obvious from the contract, and I am not going to write terms into Article 11. *See Marks & Spencer pls v. BNP Paribas Secs. Servs. Tr. Co. (Jersey) Ltd.*, [2015] UKSC 72, ¶¶ 22–23 (explaining that a term will be implied into the contract only if a "reasonable reader . . . reading the contract at the time was made . . . would consider the term to be so obvious as to go without saying or to be necessary for business efficacy" (citing *Attorney General of Belize v. Belize Telecom Ltd.*, [2009] UKPC 10)).

issue redemption payments.  Even when issuing a NAV in bad faith, Citco still acted "with actual

or usual authority."[38]  As the Bankruptcy Court correctly observed, those Redemption Payments

"were lawful and discharged the Funds' valid obligations" under the Articles.  *Fairfield II*, 596

B.R. at 298.  Because Citco acted with "actual or usual authority," Appellants' claims are barred

and Article 11 does not help them.

Appellants also suggest that they, as the Liquidators, do not recover the money for the

benefit of the Funds, but only to equitably distribute the funds among the investors. (*See* Open.

Br. I 41–42.)  However, the BVI Insolvency Act provides that "[a] liquidator is the agent of the

company in liquidation," § 184(2), and BCA creates no exception for companies in liquidation

represented by liquidators.  In other words, Appellants are no different from the Funds

themselves bringing the claims to recover the Redemption Payments.

Appellants next argue that I should follow *Weavering II*, where the Privy Council was

faced with a similar situation but ordered the redeemed investors to pay back the money.  [2019]

UKPC 36.  In *Weavering II*, the investment company's manager fraudulently inflated the NAVs

by entering into interest rate swaps that he knew to be worthless in order to create an illusion of

sustained growth, while in reality the company had suffered substantial losses.  After the

company went into liquidation, the liquidators sought to recover redemption payments made to

the defendant investor who received large payments shortly before the fraudulent scheme

collapsed.  The claims were brought pursuant to Cayman Island law, which provided that

preferential conveyance made at a time when the company is "unable to pay its debts" is invalid.

*Id*. ¶ 2.  The defendant argued to the Privy Council that the NAVs were not binding because they

---

[38] This case does not present the issue where a contract provides that Citco has no authority to issue NAVs if it acts
in bad faith.  Nevertheless, it is hard to imagine that such a provision would be upheld by a BVI court against the
BCA, as it frustrates the statute's purpose by making it almost impossible for "a person dealing with the company"
to ascertain whether the agent acts in "actual or usual authority."

were fraudulently inflated, Weavering was not obligated to honor those redemption requests, and the company was therefore not "unable to pay its debts" under the meaning of the statute. *Id*. ¶ 12. The Privy Council distinguished this case from *Migani*, because "[*Migani*] does not address the question whether a NAV would be considered to have been determined in accordance with the articles if the directors themselves had fraudulently inflated the value of the assets." *Id*. ¶ 24. Because this was a fraud "internal to the company," the company was thus "in breach of its duty under the contract to act in good faith." *Id*. ¶ 27. Consequently, the "dishonest valuation of assets was not made 'pursuant to these articles' and therefore was not 'binding on all persons.'" *Id*.

The parties raised various argument concerning why *Weavering II* should or should not govern this case. (*See* Open. Br. I 33–43; Con. Br. I 29–34.) I need not resolve the various issues under BVI case law to address these arguments, because I find that *Weavering II* does not control as it does not concern BCA § 32(1)(e), or a similar Cayman Islands statute. Even if under *Weavering II*, internal fraud or a company's bad faith, like with Citco, may require the unsuspecting redeemers to give back the inflated redemption payments in a liquidation proceeding, that common law ruling would not vitiate the clear statutory prohibition under the BCA against bringing such a claim.[39]

### D. *Contract Claims*

As with their Common Law Claims, Appellants' Contract Claims are based on Article 11's provision that a NAV "given in good faith" shall be binding. Appellants ask me to imply from this provision that (1) a NAV given in bad faith is not binding, and (2) they as Liquidators

---

[39] Consequently, I do not address other grounds for dismissal found by the Bankruptcy Court, including that Appellees have paid good consideration, and that Appellants cannot restore the situation back to the status quo.

can sue on behalf of the Funds to recover the Redemption Payment calculated based on bad faith

NAVs.  (Open. Br. I 57–60.)  For the same reasons stated above, I need not address Appellants'

arguments, because BCA § 32(1)(e) bars Appellants from asserting that the NAVs issued by

their agent Citco were not valid.  *See supra* IV.C.3.  In any case, even if I find that the NAVs

calculated on bad faith constitutes a breach of contract, I would decline to imply a term in the

Articles allowing the Funds to recover overpayments based on the fraudulently inflated NAVs

issued by themselves.  Such a term would allow the Funds to benefit from their own fault, which

is disfavored under the BVI law, and "a contract will generally be construed in such a way as to

prevent a party from taking advantage from its own wrong."  *Fairfield II*, 596 B.R. at 299 (citing

*Kingate Global Fund v. Kingate Mgmt. Ltd*. [2015] SC (Bda) 65 Com, [157] ("[A] party will not

generally be entitled to take advantage of his own breach of contract as against the other

party.")).

    For those Appellees who were aware of the fraudulent nature of the NAVs at the time of

redemption, although the claims against them were not barred by § 32(1)(e), *see* § 32(2), they are

still barred by the doctrine of *ex turpi* as the Funds themselves were at fault.  *See supra* IV.C.3.

As the Bankruptcy Court found—and neither party disputed—the remedy for the Appellants

against these Appellees lies in the constructive trust claims.  *Fairfield II*, 596 B.R. at 301.

### E.  *The Constructive Trust Claims in the Twelve Actions*

    Appellants ask me, if I affirm the dismissal of their BVI Common Law Claims and BVI

Contract Claims, to reverse the Bankruptcy Court's denial of their motion in the Twelve Actions

for leave to amend the constructive trust claims against the Knowledge Defendants.  (Open. Br.

II 59.)  Appellants argue that they are entitled to bring new constructive trust claims (the "New

CT Claims") despite that, in each of the Twelve Actions, they entered into the Stipulated

Judgments whereby their previous constructive trust claims (the "Old CT Claims") were dismissed with prejudice.

The Bankruptcy Court found that to the extent Appellants raised issues related to the constructive trust claims in the First Appeal, the Bankruptcy Court was divested of jurisdiction over those claims.  Specifically, it found that the New CT Claims and the Old CT Claims are essentially the same.  *See* 2020 WL 4813565, at *6, 12.  Now that I have affirmed the Bankruptcy Court's ruling in the First Appeal, the issue becomes whether the New CT Claims are barred by the Stipulated Judgments.

A dismissal with prejudice "constitutes a final judgment with the preclusive effect of res judicata not only as to all matters litigated and decided by it, but as to all relevant issues which could have been but were not raised and litigated in the suit." *Samake v. Thunder Lube, Inc.*, 24 F.4th 804, 815 (2d Cir. 2022) (citing *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986)).  The party seeking to invoke res judicata bears the burden to prove that the doctrine bars the second action.  *See Stewart v. Transp. Workers Union, Local 100*, 561 F. Supp. 2d 429, 437 (S.D.N.Y. 2008).  Once res judicata applies, the second action generally is barred unless the final judgment in the first action was vacated pursuant to Rule 60(b).  *See Nemaizer*, 793 F.2d at 61; *see also Samake*, 24 F.4th at 816 n.7 ("[T]he usual procedure to set aside a notice of dismissal is through a Rule 60(b) motion to vacate the notice."  (collecting authorities)).

"In deciding whether a suit is barred by res judicata, it must first be determined that the second suit involves the same claim or—nucleus of operative fact—as the first suit." *Channer v. Dep't of Homeland Sec.*, 527 F.3d 275, 280 (2d Cir. 2008) (internal quotation marks omitted).  To determine whether the two actions involve the same claim or the same transaction, "we look to (1) whether the underlying facts are related in time, space, origin, or motivation, (2) whether

they form a convenient trial unit, and (3) whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Stewart*, 561 F. Supp. 2d at 438 (citing *Marvel Characters v. Simon*, 310 F.3d 280, 287 (2d Cir. 2002)). "Res judicata applies even where new claims are based on newly discovered evidence, unless 'the evidence was either fraudulently concealed or it could not have been discovered with due diligence." *Jean-Gilles v. Cty. of Rocklan*d, 463 F. Supp. 2d 437, 457 (S.D.N.Y. 2006) (citing *L-TEC Elecs. Corp. v. Cougar Elec. Org., Inc.*, 198 F.3d 85, 88 (2d Cir. 1999)).

The Bankruptcy Court found that the New CT Claims arise out of the same transaction as the Old CT Claims. Appellants argue that the Bankruptcy Court erred because the two sets of claims do not share the same "nucleus of operative fact." Specifically, Appellants argue that although the Old CT Claims centered on Citco's knowledge and bad faith, the New CT Claims centered on Defendants' knowledge. (*See* Open. Br. I 61.) This argument misconstrues the standard for res judicata. As the Bankruptcy Court correctly pointed out, the two sets of claims concern the same transaction, the same redemption payments, the same allegation of inflated NAVs, and the same legal basis under the BVI common law. *See* 2020 WL 4813565, at *6. The shift in the focus of bad faith from Citco to Defendants is at best a change of legal theory that does not alter the effect of res judicata. *See Garcia v. Scoppetta*, 289 F. Supp. 2d 343, 349 (E.D.N.Y. 2003) ("If the two actions stem from the same transaction or series of transactions, res judicata will bar the second action even if it is based on a different legal theory." (citing *Woods v. Dunlop Tire Corp*., 972 F.2d 36, 39 (2d Cir. 1996).).

Appellants further argue that the New CT Claims are not barred because they need not plead facts pertaining to Defendants' knowledge until the Bankruptcy Court held in *Fairfield II* that Citco's knowledge was irrelevant for a constructive trust claim. (Open. Br. II 61.) Even

assuming that Appellants could not foresee the Bankruptcy Court's ruling, they voluntarily entered into the Stipulated Judgments and agreed to the dismissal with prejudice after *Fairfield II* was issued.  If Appellants did not intend to preclude all constructive trust claims in the Twelve Actions, they should not have agreed to the Stipulated Judgments in those actions.  Appellants also claims that the facts pertaining to Defendants' knowledge "could not have been discovered with due diligence" because "they were not publicly known until . . . after Plaintiffs filed their prior complaints," for the same reason, the New CT Claims are not precluded even if res judicata applies, because the discovery of new evidence entitles them to vacate the Stipulated Judgments pursuant to Rule 60.  (*Id.* at 62.)  Appellants do not provide any evidence to show that they genuinely could not have discovered the evidence, and the bare allegation that Defendants' knowledge was not "publicly known" is not sufficient for Appellants to carry their burden.  *See Stewart*, 561 F. Supp. 2d at 437; *see also Chestnut v. Wells Fargo Bank, N.A.*, No. 10-CV-4244(JS)(ARL), 2012 U.S. Dist. LEXIS 119059, at *10 (E.D.N.Y. Aug. 20, 2012) (denying vacatur under Rule 60 where the plaintiffs "fail to explain why they were 'justifiably ignorant' of the [new evidence]").

Consequently, Appellants are not entitled to amend the complaint and add the New CT Claims in the Twelve Actions.[40]

---

[40] Consequently, I need not address the argument raised by Deutsche Bank in its Supplemental Brief, because I have affirmed its dismissal on other grounds.

V.     <u>**Conclusion**</u>

For the foregoing reasons, the Bankruptcy Court's decision below is AFFIRMED.  The

Clerk of Court is respectfully directed to terminate the open motions and close all

administratively consolidated cases in this action, *In Re: Fairfield Sentry Limited*, 19-cv-03911.

SO ORDERED.

Dated: August 24, 2022
          New York, New York

Vernon S. Broderick
United States District Judge